**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Miami Division

100079 CANADA, INC., a foreign
corporation,

      Plaintiff,

vs.                              **Case No. 11-cv-22389-SCOLA/BANDSTRA**

STIEFEL LABORATORIES, INC.,
a Delaware corporation, and
CHARLES W. STIEFEL, an individual,

      Defendants.

_____/

## <u>AMENDED COMPLAINT</u>

      Plaintiff, 100079 Canada, Inc., hereby sues Defendants, Stiefel Laboratories, Inc. (the "Company" or "SLI"), a Delaware corporation, and Charles W. Stiefel, and states:

### NATURE OF THE ACTION

      1. This case arises from the backroom self-dealing and the knowing and material misrepresentations and omissions of the Defendants.  Defendant Charles Stiefel, at all relevant times, exercised *de facto* ownership and voting control over the Company, a leading pharmaceutical company specializing in the development, manufacturing and marketing of products for the care and treatment of skin problems and diseases.  Specifically, the Defendants – to the exclusion of the larger SLI Board – conspired to repurchase a substantial portion of Plaintiff's shares at prices that they knew were grossly undervalued while at the same time withholding their secret plans to sell the Company and their shares at a premium.   The Defendants knew the shares were undervalued because their long-time valuation professional – Terence N. Bogush, C.P.A. ("Bogush") – was not an independent appraiser as required by applicable law and did not use appropriate valuation methodologies.  By virtue of their actions,

the Defendants knowingly cheated Plaintiff out of over $40 million and lined their already deep pockets.  Unfortunately, their conduct was not isolated.  Hundreds of former Stiefel employees were victim to the same pervasive acts of self-dealing – namely, the disingenuous repurchase of substantial amounts of SLI stock at grossly undervalued prices while Defendants secretly planned to sell the Company at a high premium.  Just months after these repurchases, including the repurchase of Plaintiff's shares, the Company was sold to GlaxoSmithKlein plc ("Glaxo") in April 2009 at large multiples over the repurchase prices in a cash transaction valued at approximately $3.5 billion.

2. Plaintiff asserts four claims against Defendants:  (i) violation of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C, §§ 78a-78kk, and Rule 10b-5 of the Securities and Exchange Commission (the "SEC") and Section 20(a) of the Exchange Act, § 15 U.S.C. §§ 78j and 78t; (ii) breach of fiduciary duty; (iii) fraudulent misrepresentation; and (iv) negligent misrepresentation.

## JURISDICTION AND VENUE

3. This Court has federal question jurisdiction pursuant to 15 U.S.C. §§ 78aa, 78j, and 78t, and 17 C.F.R. § 240.10b-5, and diversity jurisdiction pursuant to 28 U.S.C. § 1332.

4. This Court has personal jurisdiction over Defendants pursuant to Rule 4(k)(1)(A), Fed. R. Civ. P., because they committed torts in Florida that caused damages to Plaintiff in Florida, and thus all Defendants would be subject to the jurisdiction of a court of general jurisdiction in the State of Florida.

5. Venue is proper in this Court pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because the tortious acts and omissions complained of herein occurred in substantial part in the Southern District of Florida, the headquarters and principal place of

business of Defendant Stiefel Laboratories, Inc. was, at all relevant times, in the Southern District of Florida, and Defendants resided, at all relevant times, in the Southern District of Florida.

### THE PARTIES
#### Plaintiff

6. Plaintiff 100079 Canada, Inc., is a corporation organized and existing under the laws of Canada formed for the purpose of holding and owning SLI shares.  Plaintiff was a minority shareholder in SLI.  Plaintiff is owned and controlled by Richard J. MacKay ("Mr. MacKay"), his wife and a family trust controlled by Mr. MacKay. Mr. MacKay worked at SLI for over three decades.

7. Mr. MacKay is a resident of Montreal, Quebec, Canada.   He began his career as a pharmaceutical representative in 1958.  In 1962, he joined Winley-Morris, Ltd. as a sales manager and, in that capacity, came to know Werner and Herbert Stiefel, who are now deceased. Werner Stiefel was then the CEO of the Company.  Winley-Morris, a Canadian company, distributed Stiefel products across Canada.

8. In 1975, Werner and Herbert Stiefel approached Mr. MacKay to start and head Stiefel Canada, Inc. ("Stiefel Canada").  Stiefel Canada was set up as a partnership between SLI and Mr. MacKay, who invested $24,000.00 in exchange for a 24% equity interest in Stiefel Canada and was appointed as its President, CEO and director of Stiefel Canada, positions which he held until the April 2009 sale to Glaxo.

9. Mr. MacKay built Stiefel Canada from the ground up by forging close relationships with doctors, smart growth and various acquisitions.  Mr. MacKay's business strategy and techniques were later emulated and implemented by Defendant Charles Stiefel and other key

3

executives throughout the Company.

10.     In light of Mr. MacKay's success with Stiefel Canada, in the early 1980's he was asked to get involved with SLI's international division and was appointed to head SLI operations in Japan and Korea, which resulted in his Stiefel Canada equity being converted into SLI shares. The conversion was based on an internal valuation of both SLI and Stiefel Canada. Stiefel Canada, at that time, comprised approximately 20% of the total value of the Company. The conversion resulted in Plaintiff owning just less than 5% of all SLI shares.

11.     Mr. MacKay was appointed to the Board of Directors of SLI in 2002. Prior to this nomination, the board was made up of only Stiefel family members. Defendant Charles Stiefel replaced his brothers and sisters, and the new board consisted of Charles Stiefel, Herbert Stiefel, Todd Stiefel, Brent Stiefel, Richard MacKay and Gabriel McGlynn (Vice President of Europe). In April 2007, Mr. MacKay was appointed Vice Chairman of the Board of SLI while continuing as President and CEO of Stiefel Canada.

12.     Mr. MacKay was terminated as an employee in 2009 after the purchase of the Company by Glaxo as further described below.

13.     Prior to his termination, Mr. MacKay's relationship with the Stiefel Family Defendants was essentially that of a long-term partner; his efforts were instrumental to the growth and success of the Company. In a January 30, 2007 internal press release distributed to the Company's employees, Defendant Charles Stiefel summed up Mr. MacKay's worth and importance to the Company when he beamed, "Dick has been unstinting in his contribution to the growth and development of Stiefel worldwide. He has demonstrated his talent for global vision and shown exemplary leadership in a number of international executive positions. He is one of the key leaders in our company's history."

**Defendants**

14.     At all relevant times, SLI was a specialized pharmaceutical company that focused on development and sale of dermatological and skin care products.  Formed in Europe in 1847 by John D. Stiefel, it held itself out as the world's largest independent pharmaceutical company specializing in dermatology.  The Company grew to market and sell a variety of prescription and non-prescription products in more than 100 countries.  For several years prior to the 2009 Glaxo sale, SLI had annual sales approaching $1 billion and approximately 4,000 employees.

15.     Defendant, Charles W. Stiefel ("Charles Stiefel"), was, at all relevant times, a United States citizen and a resident of Coral Gables, Florida.  He is currently a resident of Raleigh, North Carolina. At all relevant times, Charles Stiefel served as Chairman of the Board of Directors and Chief Executive Officer of the Company. Defendant Charles Stiefel was actively involved in and exercised actual control over the day-to-day operations of the Company. On information and belief and at all relevant times, Defendant Charles Stiefel individually owned approximately 90% of the voting common stock of the Company and, along with other members of his family or entities that he owned or controlled, more than 90% of the outstanding voting common stock and more than 60% of the total outstanding common stock of the Company.  Defendant Charles Stiefel owed Plaintiff the fiduciary duties of loyalty, good faith, and fair dealing as a controlling shareholder, director and officer to a minority shareholder.

## FACTS COMMON TO ALL CAUSES OF ACTION
### Defendants' Secret Insider Information

16.     The Defendants were privy to secret information – which was not known or made available to Plaintiff or Mr. MacKay – concerning the Company, its operations, finances, financial condition, present and future business prospects and matters impacting the fair market value of the Company and the Company's shares.

17.     Defendants had access to material information about the Company not otherwise available to other Directors, including Mr. MacKay, because of their ownership and voting control over the Company.

18.     Not only were Defendant Charles Stiefel and his sons Brent Stiefel and Todd Stiefel senior executive officers and directors, but they also formed a virtual "Super Board" that, as part of a pattern and practice, made all key decisions in meetings that were conducted outside the presence of the full Board.  Defendant Charles Stiefel and his sons regularly held "pre-board" meetings at which they would make key decisions.  They would then present predetermined decisions to the Board for rubber-stamp approval.

19.     Defendant Charles Stiefel also controlled or possessed the authority to control information given to Bogush for use in his valuations of the Company's stock.

20.     The Bogush valuations were chronically, severely undervalued for over a decade, and this fact was well known by Defendants.  Defendants purposely used this inside knowledge to the detriment of any shareholder who sold stock to the Company, including Plaintiff.

21.     Defendants were aware, or should have been aware, of the misrepresentations and omissions that were made to Plaintiff, or they had the ability and opportunity to prevent such misrepresentations or omissions or cause them to be corrected.

22.     Defendants owed fiduciary duties to Plaintiff under the common law, because Plaintiff was a minority shareholder.  In light of his relationship with the Stiefel family going back nearly 50 years, Mr. MacKay and Plaintiff had the right to expect, and did expect, that he would be treated as a partner by Defendants.

**The Bogush Valuations**

23.     Effective April 16, 1975, the Company established its Employee Stock Ownership

Plan and Trust (the "Employee Plan"), which was governed by the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 *et seq.* ("ERISA"), as well as the Employee Plan documents.  The Employee Plan was set up to allow Company employees to share in the growth of the Company and to be a qualified stock bonus plan under the Internal Revenue Code of 1986, 26 U.S.C. § 1 *et seq.* ("IRC"), specifically IRC §§ 401(a) and 409. ERISA requires any company with an employee plan to obtain at least an annual valuation to be performed in good faith and based on all relevant factors for determining the fair value of securities.

24.     While neither Plaintiff nor Mr. MacKay were participants in the Employee Plan, the annual valuations performed for the Employee Plan participants were also used by the Company as a means to determine share price for any employee or entity selling shares back to the Company, including Plaintiff.

25.     As Trustee of the Employee Plan, Defendant Charles Stiefel had a duty under the Employee Plan to "retain an independent appraiser who meets the requirements similar to those contained in regulations under section 170(a)(1) of the [IRC]."  The Company retained Bogush beginning in the mid-1980's, and in every year thereafter, to perform its annual valuation appraisals.[1]

26.     The annual valuations performed by Bogush (the "Bogush Valuations") were not in good faith because the appraisals were not performed by a person who customarily makes such appraisals and who is independent of [the Company] under §§ 54.4975-7(b)(9) and (12).[2]

---

[1]     Bogush was originally hired by Werner Stiefel, who was Trustee of the Employee Plan until 2002, when Charles Stiefel assumed that position.

[2]     These sections refer to the regulations promulgated under the IRC, specifically 26 C.F.R. § 170A-11(d)(5).  "For purposes of §§ 54.4975-7(b)(9) and (12) of this section, *valuations must be made in good faith and based on all relevant factors* for determining the fair market value of securities. . . .   [For transactions with non-disqualified persons,] a determination of fair market value based on at least an

Bogush performed only one valuation a year – the Company's valuation and only the Company's valuation – and therefore did not "customarily make such appraisals."  Bogush had also been an employee of SLI, having worked as a comptroller at one of SLI's plants,  and therefore  was not neutral or independent of the Company.

27.    At all relevant times, Bogush was not a qualified appraiser under IRC § 401(a)(28)(C) because he did not "hold himself or herself out to the public as an appraiser or perform appraisals on a regular basis." 26 CFR § 1.70A-13 (5)(A).  Further, Bogush was legally excluded and could not have been a qualified appraiser at relevant times because he was a person who "does not perform a majority of his or her appraisals made during his or her taxable year for other persons." 26 CFR § 1.70A-13 (5)(C)(iv).

28.    By virtue of their long relationship with Bogush, the Defendants knew that Bogush was legally unqualified and not competent to perform the annual appraisals.  At all relevant times, each Defendant had a duty to Plaintiff to ensure that the Company's stock was correctly valued when Plaintiff sold 750 of its shares to the Company in June of 2008.

29.    The Bogush Valuations undervalued the Company's stock by, among other things, use of a 35% discount for lack of marketability, and other incorrect appraisal methods. At all material times, Defendants knew or should have known that the Bogush Valuations severely undervalued the Company's stock.

30.    Defendants based the annual valuations of the Company's stock directly upon the Bogush Valuations that they knew or should have known were performed by a legally unqualified and excluded person, and were undervalued.

---

annual appraisal independently arrived at by a person who customarily makes such appraisals and who is independent of any party to a transaction under §§ 54.4975-7(b)(9) and (12) will be deemed a good faith determination of value."  26 C.F.R. § 170A-11(d)(5) (emphasis added).

31.     As a direct result of the annual under-valuations, shareholders who sold their shares back to the Company, including Plaintiff, were short-changed by at least the amount of the undervaluation at the time their shares were sold to the Company.  Defendants were likewise unjustly enriched by the difference in the sales price and the true value of the shares, to the extent that it reduced the number of outstanding shares in the Company and therefore favorably impacted the value of their own outstanding shares.

32.     The Bogush Valuations purportedly reflected the fair market value of shares as of March 31st of each year.  The valuation as of March 31, 2007 was established at $14,517.00 per share (the "2007 Bogush Valuation").  As of March 31, 2008, the valuation was established by Bogush at $16,469.00 per share (the "2008 Bogush Valuation").

33.     The communication from Defendant Charles Stiefel dated December 6, 2007 to all Company shareholders, including Plaintiff, announcing the 2007 Bogush Valuation falsely represented that "our *independent* appraisers calculate the value of the Stiefel shares" and that those appraisers utilize the "comparative fair market value method."  (emphasis added).

34.     The communication from Defendant Charles Stiefel dated October 14, 2008 to all Company shareholders, including Plaintiff, announcing the 2008 Bogush Valuation falsely represented that "we engage a separate *independent* accounting firm" and that "Stiefel Laboratories *obviously* has no influence whatsoever on the methodology used by the appraisal firm." (emphasis added).

35.     The 2007 and 2008 Bogush Valuations failed to take into account Defendants' discussions and plans to sell the Company or the nature of Blackstone's involvement, as further described below. In addition, the 2007 and 2008 Bogush Valuations completely ignored Blackstone's valuations of the Company, or its purchase of Company stock in August 2007 for

$500 million, or approximately $60,000 per share.  Defendants failed to advise Bogush – or Bogush completely ignored – the Company's intention to enter into discussions or negotiations for the sale of the Company before and after the Blackstone purchase of Company stock.

36.     On or before August 2007, a number of independent third party valuations of the Company – none of which was performed by Bogush – were conducted in connection with various financial transactions involving the Company.  On information and belief, all of the third party valuations were significantly higher than both the 2007 and 2008 Bogush Valuations. Defendants were aware of these higher valuations placed on the Company.

37.     That the Bogush Valuations were grossly undervalued is also shown by independent valuations done in connection with the processes resulting in the Company's acquisition of Connetics Corporation in December 2006 and the Blackstone investment in August 2007, as further described below.

**The Blackstone $500 Million August 2007 Investment**

38.     On August 6, 2007, and after months of discussion beginning in 2006, nonparty Blackstone Healthcare Partners, LLC, a Delaware limited liability company, entered into a Securities Purchase Agreement to invest $500 million in SLI by purchasing what was labeled "preferred stock" that was convertible 1:1 to common shares in the Company.  Blackstone Healthcare Partners LLC is part of an affiliated group of entities within the Blackstone Group, more than one of which were involved in the transactions described herein.  For ease of reference, they will be referred to simply as "Blackstone."

39.     To arrive at the purchase price for the August 2007 investment, Blackstone  gave the Company  an enterprise value of $2.9 billion and an equity value of $2.1 billion.

40.     Defendants purposely, recklessly or negligently misrepresented the value of the

Company to Plaintiff, or omitted to state material facts that would have corrected Plaintiff's misimpression.

41.     After Blackstone invested $500 million to acquire shares in the Company for $60,000.00 per share in August of 2007, Blackstone and its affiliates essentially acquired the ability to force a sale of the Company within eight years.

42.     Blackstone's *modus operandi* is to take companies public or sell them soon after investing in them.  By way of certain covenants in Blackstone's agreement with the Company, including but not limited to a provision that Blackstone had to recoup its investment within eight years, the Blackstone investment marked a significant step in Defendants' efforts to sell the Company.

43.     Before and after Blackstone's investment in the Company, the Defendants and Blackstone had discussed and considered the sale of the Company to Blackstone and possibly others.  In January of 2007, for example, Blackstone sent Defendant Charlie Stiefel a proposal by Blackstone to acquire the Company through a stock purchase or merger.  Defendant Charles Stiefel eventually met or conferred with representatives of Blackstone to discuss this proposal.

44.     Subsequent to Blackstone's investment in the Company, the Defendants and Blackstone discussed numerous ways by which to make the Company more profitable and efficient.  This internal due diligence is one of the classic initial steps taken by companies that are preparing themselves to be sold.

45.     Although Defendants had received and considered an acquisition proposal from Blackstone, Defendants purposely went out of their way to expressly and forcefully deny that Blackstone's investment would be for the purpose of taking the Company public or selling it. Defendants purposely issued several misleading press releases and internal communications to

its employees, including Plaintiff and Mr. MacKay, stating that the Blackstone investment was in the nature of a loan to help with short term liquidity issues, not a step towards selling the Company, and that the Company was not for sale.  In fact, Defendants repeatedly emphasized that the purpose of the Blackstone investment was to provide the Company with cash to be used for future acquisitions by the Company, as opposed to a future sale of the Company.

46.     Plaintiff relied on the misrepresentations and omissions made by the Defendants to its detriment.

**Defendants Purposely Withhold their Plans to Sell the Company
While Making Contrary Representations**

47.     Throughout its 160-year history, and prior to the April 2009 sale to Glaxo, the Company had been a privately held corporation.  A majority of its shares had been and were owned by Stiefel family members or entities under their control.

48.     The Defendants had, until the events described herein, steadfastly asserted to the public, their employees and their shareholders that the Company was not for sale and would remain privately held.  For example:

> a.     On March 8, 2007, in a *Miami Herald* article, Charles Stiefel stated, "[t]he family has no plans to go public...There are so many advantages to being private…."
>
> b.     In a letter dated August 9, 2007 to Company employees and shareholders, Charles Stiefel states "[t]here are currently no plans for Stiefel to become a publicly traded company.  Blackstone will have a defined exit arrangement with Stiefel at the end of eight years, at which point Stiefel may choose to buy back its shares or exercise other options, one of which might be an initial public offering."
>
> c.     On August 10, 2007, the Company was quoted in a *Miami Herald* article about its receipt of a $500 million infusion from the Blackstone Group, a New York-based asset manager. According to the article, the Company "stressed that the company will remain a

family-controlled business," and denied rumors of a corporate restructuring by explaining that although, "Blackstone, like most private equity firms, often plots an exit strategy through a public offering of stock – [it is] something that Stiefel has said in the past the company has no interest in."

    d.    After the $500 million investment by Blackstone into the Company, the Company and Charles Stiefel reiterated their mantra that the Company was independent and not for sale by explicitly saying so in communications to employees and shareholders. These misleading communications by Defendants included statements made in direct response to employees' questions concerning whether the Blackstone deal indicated the Stiefel Family Defendants might sell or take the Company public.

    e.    Placing information in corporate strategic plans available to Company executives and employees as late as September 2008 indicating that the Company would continue to be "[p]rivately held and led by the Stiefel family."

49.    While making these representations to the public in 2007 and 2008, the Defendants were knowingly acting in direct contravention of these representations in their secret efforts to sell the Company or take it public.  The following e-mail exchanges establish that the Defendants knew these representations were false at the time they were made:

    a.    On January 2, 2007, a Blackstone representative sent Charles Stiefel a term sheet titled "Terms Relating to Blackstone's Acquisition of Stiefel Laboratories, Inc." that contemplated an a purchase price for SLI based upon a $1.755 equity valuation;

    b.    On May 10, 2007, Todd Stiefel and Brent Stiefel received an email from a Blackstone representative that, in part, stated: "I believe we owe you a response on three last issues: the issue of the form of consideration in the event of a sale, the protective provision pertaining to the issuance of additional class B shares, and the IPO make-whole language."

    c.    On July 31, 2007, Charles Stiefel sent another e-mail to the Blackstone representative stating that Blackstone's level of "financial sophistication . . . will become increasingly important as we seek to make additional acquisitions, and perhaps eventually pursue an IPO." Charles Stiefel further noted that he "looked forward very much to

seeing Blackstone's valuation tomorrow."

d.    On September 6, 2007, following the now-closed $500 million Blackstone investment and in advance of a meeting with several Blackstone investment bankers, Todd Stiefel wrote:  "I was planning on having just me, my father and my brother for the meeting."  He further stated that "we would just go to dinner with you folks and the three of us without calling it a celebration dinner (so the others do not feel left out from the celebration)."

e.    On December 28, 2008, Brent Stiefel wrote to yet another Blackstone investment banker, with a copy to Charles Stiefel, in regards to a potential sale of SLI to Sanofi Aventis, and noted "[w]e want to make sure we sell the 'reluctant bride' story in the best possible manner."  In response, the Blackstone representative told Brent Stiefel: "At this juncture, we (Blackstone M&A advisory) would typically interface with buyers and negotiate the NDAs, but as you point out, we are going to maintain the image that there is not currently a sale process."

50.    None of the information contained in this exchange of e-mails and none of the statements made in these e-mails was communicated to Plaintiff or Mr. MacKay.  All would have been relevant and material to Plaintiff's subsequent decision to sell the 750 shares.

**Plaintiff Sells its Shares**

51.    In early to mid-May 2008, Mr. MacKay had a series of discussions with Defendant Charles Stiefel indicating that he wanted to sell 100 shares held by Plaintiff for estate planning purposes.  Mr. MacKay further stated that he wanted to sell 100 shares held by Plaintiff in each of the next several years, in order to ensure that his wife would have sufficient funds should something happen to him.  Defendant Charles Stiefel told Mr. MacKay in those discussions that the Company could not guarantee continuous annual buy-backs of its shares going forward and that, excluding the very near future, he could not guarantee any additional opportunities whatsoever to sell shares back to the Company.

52.    As a follow-up to those discussions, Defendant Charles Stiefel contacted Steve

14

Karasick, the Senior VP for People & Technology at the Company ("Karasick"), and communicated the above-described conversation and representations. Karasick, in turn, spoke to Mr. MacKay, reiterated Charles Stiefel's statements to Mr. MacKay and sent the following e-mail to Mr. MacKay on May 14, 2008:

> Dick, Thanks for your time today on the phone. In regards to the proposed sale of stock, please find attached a simple spreadsheet that I believe captures what we discussed. Namely, it outlines the proposed sale of 750 shares of stock before June 15, 2008, and a tiered rate of discount. The stock price and discount tiers are included for your review.

The spreadsheet showed the "Current Share Price" to be $14,517.00, which was the grossly undervalued price established by the faulty 2007 Bogush Valuation. The 2007 Bogush Valuation had already heavily discounted the share price, but the spreadsheet further discounted the share price to an average additional discount (depending on number of shares sold) of 17.80%. Mr. MacKay was told by both Defendant Charles Stiefel and Karasick that these additional discounts were Company policy as a result of the lack of marketability of the shares. Mr. MacKay agreed to sell a maximum of 750 shares because the spreadsheet indicated that any additional shares sales over 750 would be discounted at the very high rate of 30%.

53.     As a result of his discussions with Defendant Charles Stiefel and Karasick and in response to Karasick's May 14th e-mail, Mr. MacKay sent the following e-mail on May 15, 2008 to Karasick:

> I want to thank you for following up on my discussions with Charlie. I appreciate that with your busy schedule, that we were able to resolve the situation before the end of June.
>
> My own inclination would have been not to sell the shares since I strongly believe in the future of Stiefel. However, in view of the fact that the company cannot fully guarantee continuous annual by-backs, my fiscal advisor feels that this would give Francine a greater sense of security, should something happen to me, and not have to worry each year whether the company would by-back shares.

54.     In response, on May 15, 2008, Karasick sent the following e-mail to Mr. MacKay:

> Dick, it is my pleasure as always to work with you.  You've been an inspiration and a helpful advisor for me, ever since we met for that first dinner in Montreal back in 2005.
>
> I do understand your point of view, and given the size of your holdings and your long service, I don't think anyone could possibly doubt your steadfast belief in Stiefel.  You helped build the house from the ground up, and this is just a natural progression of your estate planning, in my opinion.  And of course, it is also affected largely by the debt position and covenants, without which you might be inclined to another course of action.

55.     On May 16, 2008, having received and reviewed Karasick's May 15th e-mail, Mr. MacKay sent the following e-mail to Charles Stiefel, copying Karasick:

> Good morning Charlie,
> This will confirm that I wish to sell 750 shares held by 100079 Canada Inc. to SLI pursuant to the discount schedule outlined in the attached spreadsheet.
> Kindest regards,
> Dick

The spreadsheet attached to this e-mail is the same as the spreadsheet that was sent to Mr. MacKay by Karasick as an attachment to Karasick's May 14, 2008 e-mail, quoted above.

56.     In response, on May 16, 2008, Defendant Charles Stiefel sent the following e-mail to Mr. MacKay, copying Karasick:  "Dick, I hereby accept your offer on behalf of SLI. Please send to Matt Pattulo the stock certificate(s), either signed on the back or accompanied by a duly executed standard stock power, and he will handle the rest."

57.     The transaction for the sale of Plaintiff's shares was consummated on June 18, 2008.  The average price per share received by Plaintiff was $11,932.97, resulting in total proceeds of $8,949,730.50 for the 750 shares sold by Plaintiff.

58.     In forming his decision to sell Plaintiff's 750 shares in June of 2008, Mr. MacKay reasonably relied on the faulty 2007 Bogush Valuation, as well as the knowing omissions and misrepresentations of Defendant Charles Stiefel that there was no market for the Company stock, that the Company could not guarantee continuous annual buy-backs and that the Company would not be sold.  The Defendants repeatedly emphasized these statements to shareholders when offering to purchase their shares for the artificially low prices established by the undervalued Bogush Valuations.  It was the Company's policy to purchase non-employee plan shares at the Bogush Valuation price less an additional discount of at least 10 percent.

59.     Defendant Charles Stiefel directly and through his agent, Karasick, pressured Mr. MacKay to sell Plaintiff's shares at an artificially low price in June 2008 by, in part, telling Plaintiff and Mr. MacKay that if Plaintiff did not sell at that time, he might not have another opportunity to sell in the next several years.

60.     Beginning in 2007, and perhaps earlier, and through 2008, Blackstone and the Defendants began to discuss, consider and plan the possible sale of the Company, and entered into discussions and negotiations for the sale of the Company with potential acquirers, including Blackstone itself.

61.     In late 2008, Defendants also contracted with a separate arm of Blackstone, Blackstone Advisory Services L.P., for consulting services with the express purpose of accomplishing the sale of the Company.  This consulting contract with Blackstone was intentionally concealed from the other directors, including Mr. MacKay.

62.     Had Plaintiff been informed that Defendants were considering or planning to sell the Company a few months later for a value of approximately $75,000.00 per share, Plaintiff would not have sold 750 of its shares for only $11,932.97 per share in June of 2008.

Defendants' knowing misrepresentations and omissions concerning material facts were the actual and proximate cause of damages in the millions of dollars suffered by Plaintiff.

63.     Prior to Plaintiff's sale of the 750 shares, each of the Defendants engaged in a series of acts, misrepresentations and omissions designed to obtain shares from shareholders, including Plaintiff, at less than fair value. Those acts, misrepresentations and omissions included, but were not limited to, the following:

a.     Purposely using an unqualified appraiser to conduct supposedly "independent" valuations of the Company's stock that were chronically, severely undervalued;

b.     Allowing the unqualified "independent" appraiser to use inappropriate methods for valuing the Company and/or failing to provide the appraiser with sufficient information to allow the appraiser to properly perform his task, such as Defendants' secret plan to sell the Company;

c.     Misrepresenting to employees and shareholders, repeatedly, that the Company had always been and would always remain privately held;

d.     In connection with annual letters sent by Charles Stiefel to shareholders before June 1, 2008:

(1) Misrepresenting the actual fair value of the Employee Plan stock in effect at the time;

(2) Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company stock held by the Employee Plan;

(3) Representing that "our independent appraiser calculates the value of the Stiefel shares owned by the Employee Plan" when the appraiser was not independent as defined by law;

(4) Failing to disclose that Company employees had influence and review authority with regards to the valuations prepared by the "independent appraiser."

e.     Failing to disclose the much higher valuations of the Company that had been conducted by Blackstone and other third parties;

      f.     Failing to disclose that the Company and Charles Stiefel had discussed an IPO with Blackstone;

      g.     Failing to disclose that the Company and the Stiefel Family Defendants had discussed selling the Company with Blackstone and, upon information and belief, other third parties;

      h.     Failing to disclose that Blackstone made an offer to purchase the company as a whole in early 2007;

      i.     Failing to disclose that selling the Company was an option that the Defendants had discussed and considered; and

      j.     Failing to disclose that the Company and the Defendants had taken steps to position the Company for an eventual sale.

64.     Letters by Defendant Charles Stiefel regarding the value of the Company's shares, and touting the Bogush valuations, were sent to shareholders on an annual basis.

**The GlaxoSmithKline Sale**

65.     In late 2008, the Defendants took the final steps to accomplish the sale of the Company by retaining Blackstone to assist in the sale of the Company.

66.     The Defendants eventually formed a group of shareholders and employees in the Company who would assist Blackstone and the Company in gathering and compiling the information needed in connection with the sale.  These employees, which included Defendant Charles Stiefel and his two sons, were described as "those who know."  Unfortunately for Plaintiff and Mr. MacKay, they were not among "those who kn[e]w."

67.     From late 2008 until the sale of the Company was announced publicly, the Defendants continued to deny to the public and others that the Company as in the process of being sold.  As late as February 20, 2009, the Defendants agreed to and did concoct a "cover story" to deny to those who inquired that the Company was in the process of being sold.

68.     Finally, and after denying it for months, on April 24, 2009, the Company notified

its shareholders of a merger agreement with Glaxo, and in a statement, in part, noted as follows:

> a.      On April 19, 2009, the Company's Board of Directors met, discussed and approved the merger agreement with Glaxo.  The merger agreement was signed on April 20, 2009. As of April 20, 2009, there were 32,812 shares of Company common stock outstanding and 8,930 shares of Series A Preferred stock outstanding. *The price paid by Glaxo to the Company shareholders was $68,515.29 in cash for each share of common stock (all classes) and preferred stock with up to an additional $7,186.91 based on certain contingencies related to the merger, for a total of over $75,000.00 per share. (emphasis added).*

69.      Based upon the misrepresentations and omissions of Defendants, Plaintiff sold 750 of his shares to the Company at the artificially low price of $11,932.97 per share in June 2008.  Had Plaintiff and Mr. MacKay known that the Defendants were planning to sell the Company for at least $68,515.29 per share only a few months after the sale of the 750 shares, Plaintiff would have never sold those shares.

70.      Defendants' intentional, reckless and negligent misrepresentations were the actual and proximate cause of damages suffered by Plaintiff.  But for Defendants' misrepresentations and omissions, Plaintiff would not have sold its 750 shares to the Company at that time and price. Instead, Plaintiff – like Charles Stiefel – would have waited and sold the 750 shares at the much higher share price of at least $68,575.29.

71.      Before and after the Blackstone investment in August 2007, the fair market value as determined by the Company for the purpose of determining the sale price when a shareholder sold shares back to the Company was not in good faith.

72.      Even prior to the Blackstone deal, Defendants were negligent and reckless by using Bogush to perform valuations when they knew or should have known that he was incompetent and unqualified to perform such valuations, and they knew or should have known that his methods were inappropriate and not in accordance with accepted valuation principles.

73.     Defendants' tortious acts and omissions caused Plaintiff to sell his shares of Company stock to the Company for less than adequate consideration.

74.     Defendants caused the Company to pay Plaintiff a price for its 750 shares that Defendants  knew or should have known did not reflect the true fair value of the Company stock and without questioning the accuracy of the valuation or, alternatively, with knowledge of the undervaluation.

75.     Defendants used the 2007 Bogush Valuation when they knew or should have known that it did not reflect the true fair value of the Company stock as of June of 2008, that it did not take into consideration the 2007 purchase of Company stock by Blackstone for approximately $60,000.00 per share, or prior valuations of the Company furnished by Blackstone and others at or before the time of Blackstone's investment in August 2007.

76.     Defendants consistently and repeatedly, for decades, told Plaintiff, employees and the public at large that the Company was not for sale.  In June 2008, Defendants deliberately left Plaintiff with the misimpression that such was the case, as it had been for years, even though Defendants had already discussed an imminent sale of the Company.

77.     These foregoing acts, misrepresentations and omissions were part of a scheme by Defendants to act in their self interest to the detriment of the Company's shareholders and directors who were not part of the scheme, including Plaintiff and Mr. MacKay.

78.     Had Plaintiff known that Defendants secretly planned to sell the Company for a price exceeding $68,515.29 per share in a deal that closed only a few months later, Plaintiff would not have sold 750 of its shares for $11,932.97 per share in June 2008.

79.     Tellingly, Defendant Charles Stiefel, who had this secret insider knowledge about the pending sale of the Company, did not sell any of his shares at the artificially low price prior

to the Glaxo Sale in April 2009.

80.　　Nor did Defendant Charles Stiefel participate in the "opportunity to diversify" that was aggressively pitched by Defendants to the other employees participating in the Company's retirement program.

81.　　Defendants increased their efforts to reduce outstanding shares beginning in 2008 by terminating numerous employees and offering remaining shareholders the "optional diversification opportunity" to sell their shares to the Company at the 2008 Bogush Valuation.

82.　　By implementation of Defendants' scheme, they were able to reduce the outstanding number of Company stock. That reduction increased the stock value to the remaining shareholders, primarily Defendant Charles Stiefel.

83.　　All conditions precedent to the liability of the Defendants have occurred, been performed, or been waived.

## COUNT ONE
## VIOLATION OF THE SECURITIES AND EXCHANGE ACT OF 1934 AND RULE 10b-5 OF THE SECURITIES AND EXCHANGE COMMISSION
### (All Defendants)

84.　　Plaintiff restates and incorporates by reference all allegations made in paragraphs 1 through 86.

85.　　Each Defendant carried out a plan, scheme, and course of conduct which was intended to and did: (a) deceive the Plaintiff as to the fair value of his Company Stock; (b) artificially deflate the valuation of Company Stock; and (c) cause Plaintiff to sell his Company Stock to the Company at an artificially low price. In furtherance of this unlawful scheme, plan, and course of conduct, each Defendant took the actions set forth herein.

86.　　Each Defendant: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make

the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Plaintiff in an effort to maintain artificially low prices for the Company securities in violation of Section 10(b) of the Securities and Exchange Act and Rule 10b-5.

87.   Plaintiff sues each Defendant as a primary participant in the wrongful and illegal conduct.  Defendant Charles Stiefel is sued as a person in control of the Company under Section 20(a) of the Exchange Act.

88.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and conceal material information about the Company's fair valuation of the Company stock, which included, but were not limited to, the following:

a.   Purposely using an unqualified appraiser to conduct supposedly "independent" valuations of the Company's stock that were chronically, severely undervalued;

b.   Allowing the unqualified "independent" appraiser to use inappropriate methods for valuing the Company and/or failing to provide the appraiser with sufficient information to allow the appraiser to properly perform his task, such as Defendants' secret plan to sell the Company;

c.   Misrepresenting to employees and shareholders, repeatedly, that the Company had always been and would always remain privately held;

d.   In connection with annual letters sent by Charles Stiefel to shareholders before June 1, 2008:

(1) Misrepresenting the actual fair value of the Employee Plan stock in effect at the time;

(2) Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company stock

held by the Employee Plan;

(3) Representing that "our independent appraiser calculates the value of the Stiefel shares owned by the Employee Plan" when the appraiser was not independent as defined by law;

(4) Failing to disclose that Company employees had influence and review authority with regards to the valuations prepared by the "independent appraiser."

e.      Failing to disclose the much higher valuations of the Company that had been conducted by Blackstone and other third parties;

f.      Failing to disclose that the Company and Charles Stiefel had discussed an IPO with Blackstone;

g.      Failing to disclose that the Company and Charles Stiefel had discussed selling the Company with Blackstone and, upon information and belief, other third parties;

h.      Failing to disclose that Blackstone made an offer to purchase the company as a whole in early 2007;

i.      Failing to disclose that selling the Company was an option that the Defendants had discussed and considered; and

j.      Failing to disclose that the Company and Defendant Charles Stiefel had taken steps to position the Company for an eventual sale.

89.      All of these statements, misrepresentations and omissions were made by the Defendants and the Company, orally and in written materials and in other communications distributed by the Company to all shareholders, including Plaintiff.

90.      Each Defendant acted either with recklessness or with actual knowledge that the statements and omissions referenced herein were false and misleading and that the failure to disclose material facts would affect the determination by the Company's shareholders, including Plaintiff, as to whether to sell their shares to the Company.  Each Defendant deliberately or with recklessness refrained from taking those steps necessary to inform shareholders, including Plaintiff, of the true facts.

91.     In ignorance of the fact that the price of the securities was artificially depressed, and relying directly or indirectly on the misleading statements and omissions made by these Defendants, or on the absence of material information that was known to or recklessly disregarded by these Defendants, but not disclosed to shareholders by these Defendants, Plaintiff sold 750 of its shares to the Company at an artificially low price.  Plaintiff was thereby damaged.

92.     At the time of these misrepresentations and omissions, Plaintiff believed all statements made by Defendants were true and was unaware of any omissions. Had Plaintiff known of the fair value of the Company stock in June of 2008, including, but not limited to, the effect of the Blackstone Agreement on the fair value of the Company stock, and Defendants' discussions and plans to sell the Company, Plaintiff would not have sold 750 shares of Company stock to the Company at that time, or would not have done so at the artificially depressed price that Plaintiff received.

93.     By way of the foregoing scheme, the Company and the Defendants have violated Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder.

94.     The liability of Defendant Charles Stiefel as a control person under Section 20(a) of the Securities and Exchange Act arises from the following facts: (a) he was a high-level executive and director of the Company during all relevant times; (b) he was privy to and participated in the creation and development of the Company's internal budgets, plans, projections, and/or reports; (c) he was aware of and participated in the Company's dissemination of information to the shareholders that he knew was materially false and misleading; (d) he was Chief Executive Officer and/or President of the Company and had the authority to direct the day-to-day operations of the Company; (e) he was involved in the decision to enter into the Blackstone Agreement and the Glaxo Merger Agreement as more specifically described herein;

and (f) the percentage and value of the Company stock owned by Defendant Charles Stiefel, his family and entities that he controlled, increased significantly as a result of the repurchase of shares of Company stock from shareholders, including Plaintiff.

95.    Each Defendant made a fraudulent misstatement or omission of material fact that was made with scienter and designed to defraud, and did defraud, Plaintiff.

96.    Plaintiff relied on each of these fraudulent misrepresentations and omissions to his detriment by agreeing to sell 750 shares back to the Company for the extremely undervalued price of $11,932.97 per share.

97.    As a direct and proximate result of the wrongful conduct of the Company and the Defendants, Plaintiff suffered damages in connection with his sale of Company stock and is entitled to all available relief permitted under the Securities and Exchange Act.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY**
**(All Defendants)**

98.    Plaintiff restates and incorporates by reference all allegations made in paragraphs 1 through 86.

99.    As set forth in this Count, "Defendants" or "Each Defendant" means Defendants other than the Company.

100.    Each Defendant, because of their family heritage and the history of the company, acquired a certain "super-director" special status within the Company.  Each Defendant essentially exercised the true control of the Company, not the full Board of Directors.  Defendants did such things as conduct "pre-Board meeting" super-director meetings at which Defendants made all key decisions for the Company.  Defendants then presented pre-determined decisions to the full Board expecting and obtaining rubber-stamp approval.

101.    Each Defendant acquired certain influence over the other Directors by way of their family affiliation and Defendants' possession of secret knowledge and information that was not shared with the other Directors.  For example, the 2007 Blackstone deal was presented to the Board by way of a presentation by Defendant Charles Stiefel riddled with misrepresentations and omissions.

102.    Because of the history of the Company and his surname, Defendant Charles Stiefel exercised extraordinary power over the other Directors and high level executives in the Company.

103.    Defendants owed the fiduciary duties of good faith, loyalty, and fair dealing to Plaintiff as a minority shareholder.

104.    Defendants owed Plaintiff the fiduciary duties of good faith, fair dealing, and loyalty, because Plaintiff was a minority shareholder in the Company.  Purposefully excluding Plaintiff from knowledge of the pending sale, as well as other material information, at the time Plaintiff sold its 750 shares at $11,932.97 per share in June 2008 was done by Defendants with scienter, and it was tortious self dealing in which Defendants engaged for the sole purpose of enriching themselves at Plaintiff's expense.

105.    Defendants abused their special influence and breached their fiduciary duties to Plaintiff by purposely misleading Plaintiff as to the value of his shares at the time Defendants purchased them from Plaintiff for a severely undervalued price and by purposely misleading Plaintiff as to their plans for the future sale of the Company.  Among the several material misrepresentations and omissions that the Defendants made to Plaintiff included, but were not limited to, the following:

            a.    Purposely using an unqualified appraiser to conduct supposedly "independent" valuations of the Company's stock that

were chronically, severely undervalued;

b.      Allowing the unqualified "independent" appraiser to use inappropriate methods for valuing the Company and/or failing to provide the appraiser with sufficient information to allow the appraiser to properly perform his task, such as Defendants' secret plan to sell the Company;

c.      Misrepresenting to employees and shareholders, repeatedly, that the Company had always been and would always remain privately held;

d.      In connection with annual letters sent by Charles Stiefel to shareholders before June 1, 2008:

> (1) Misrepresenting the actual fair value of the Employee Plan stock in effect at the time;

> (2) Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company stock held by the Employee Plan;

> (3) Representing that "our independent appraiser calculates the value of the Stiefel shares owned by the Employee Plan" when the appraiser was not independent as defined by law;

> (4) Failing to disclose that Company employees had influence and review authority with regards to the valuations prepared by the "independent appraiser."

e.      Failing to disclose the much higher valuations of the Company that had been conducted by Blackstone and other third parties;

f.      Failing to disclose that the Company and Charles Stiefel had discussed an IPO with Blackstone;

g.      Failing to disclose that the Company and Charles Stiefel had discussed selling the Company with Blackstone and, upon information and belief, other third parties;

h.      Failing to disclose that Blackstone made an offer to purchase the company as a whole in early 2007;

i.      Failing to disclose that selling the Company was an option that the Defendants had discussed and considered; and

> j.      Failing to disclose that the Company and Charles Stiefel had taken steps to position the Company for an eventual sale.

106.    Each Defendant's breach of his fiduciary duties was the actual and proximate cause of damages suffered by Plaintiff.

**COUNT FOUR**
**FRAUDULENT MISREPRESENTATION**
**(All Defendants)**

107.    Plaintiff restates and incorporates by reference all allegations made in paragraphs 1 through 86.

108.    Each Defendant made false statements and omissions concerning a material fact that was material to Plaintiff's decision to sell 750 shares back to the Company at the artificially low price of $11,932.97 per share.   These false statements and omissions of material fact included, but were not limited to, the following:

> a.      Purposely using an unqualified appraiser to conduct supposedly "independent" valuations of the Company's stock that were chronically, severely undervalued;

> b.      Allowing the unqualified "independent" appraiser to use inappropriate methods for valuing the Company and/or failing to provide the appraiser with sufficient information to allow the appraiser to properly perform his task, such as Defendants' secret plan to sell the Company;

> c.      Misrepresenting to employees and shareholders, repeatedly, that the Company had always been and would always remain privately held;

> d.      In connection with annual letters sent by Charles Stiefel to shareholders before June 1, 2008:

>> (1) Misrepresenting the actual fair value of the Employee Plan stock in effect at the time;

>> (2) Failing to disclose that the purchase price of the shares did not represent the actual fair value of the shares of the Company stock held by the Employee Plan;

29

(3) Representing that "our independent appraiser calculates the value of the Stiefel shares owned by the Employee Plan" when the appraiser was not independent as defined by law;

(4) Failing to disclose that Company employees had influence and review authority with regards to the valuations prepared by the "independent appraiser."

e.      Failing to disclose the much higher valuations of the Company that had been conducted by Blackstone and other third parties;

f.      Failing to disclose that the Company and Charles Stiefel had discussed an IPO with Blackstone;

g.      Failing to disclose that the Company and Charles Stiefel had discussed selling the Company with Blackstone and, upon information and belief, other third parties;

h.      Failing to disclose that Blackstone made an offer to purchase the company as a whole in early 2007;

i.      Failing to disclose that selling the Company was an option that the Defendants had discussed and considered; and

j.      Failing to disclose that the Company and Charles Stiefel had taken steps to position the Company for an eventual sale.

109.    Each Defendant had knowledge at the time these false statements and omissions were made that the statements and omissions were false and that Plaintiff would rely on them when making the decision to agree to sell the 750 shares back to the Company at the artificially low price of $11,932.97 per share.

110.    Each Defendant intended to induce Plaintiff to rely and act on these false statements and omissions.

111.    Plaintiff did rely to its detriment on each Defendant's false statements and omissions.

112.    Each Defendant's false statements and omissions were the actual and proximate

cause of damages suffered by Plaintiff.

## COUNT FIVE
## NEGLIGENT MISREPRESENTATION
### (All Defendants)

113.    Plaintiff restates and incorporates by reference all allegations made in paragraphs 1 through 86.

114.    Each Defendant made false statements and omissions to Plaintiff concerning a material fact that was material to Plaintiff's decision to agree to sell 750 shares back to the Company at the artificially low price of $11,932.97 per share.

115.    In the exercise of reasonable care under the circumstances, each Defendant should have known the statements and omissions were false.

116.    In making the false statements and omissions, each Defendant intended that Plaintiff rely on the false statements and omissions when making Plaintiff's decision to sell 750 shares back to the Company at the artificially low price of $11,932.97 per share.

117.    Plaintiff reasonably relied on these false statements and omissions made by each Defendant to Plaintiff's detriment.

118.    Each Defendant's false statements and omissions were the actual and proximate cause of damages suffered by Plaintiff.

### Request for Trial by Jury

119.    Plaintiff hereby requests a trial by jury on all claims and issues so triable.

WHEREFORE, Plaintiff 100079 Canada, Inc. demands judgment for compensatory, as well as punitive, damages in addition to all interest, costs, attorneys' fees, and all other relief permitted by law.

Dated:  November 20, 2012.

/s/Peter Prieto _____
Peter Prieto
Florida Bar No. 501492
Aaron S. Podhurst
Florida Bar No. 63606
Matthew Weinshall
Florida Bar No. 084783
**PODHURST ORSECK, P.A.**
25 West Flagler Street, Suite 800
Miami, FL 33130
Tel:  305.358.2800
Fax:  305.358.2382
pprieto@podhurst.com
rrasco@podhurst.com

*Co-Counsel for Plaintiff*

/s/Norman Segall_____
Norman Segall
Florida Bar No. 158302
Sundeep K. Mullick
Florida Bar No. 18175
**SEGALL GORDICH, P.A.**
801 Brickell Avenue – 9th Floor
Miami, FL 33131Suite 800
Tel: 305.755.4930
Fax: 305.438.7438
nss@segallgordich.com
lag@segallgordich.com

*Co-Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 20, 2012, I electronically filed the foregoing with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

   /s/Peter Prieto_____
Peter Prieto

## SERVICE LIST
*100079 Canada, Inc. v. Stiefel Laboratories, Inc., et al.*
**CASE NO.: 11-cv-22389-JLK**
**United States District Court Southern District of Florida**
**Miami Division**

David A. Coulson, Esq.
Greenberg Traurig, P.A.
333 S.E. 2nd Avenue
Miami, FL 33131
coulsond@gtlaw.com