UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-22389-Civ-SCOLA

100079 CANADA, INC.

    Plaintiff,

v.

STIEFEL LABORATORIES, INC., et al.

    Defendants.
_____/

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the Motion for Summary Judgment [ECF No. 47], filed by Defendants Stiefel Laboratories, Inc., and Charles W. Stiefel.  The Court held oral argument on May 31, 2013.  Upon careful consideration of the record, the parties' arguments, and the pertinent legal authorities, the Court finds that the Stiefel Defendants are entitled to summary judgment.

### Introduction

This case involves securities law and common law claims by the Plaintiff, 100079 Canada, Inc. ("Plaintiff"), against a pharmaceutical skin care company, Stiefel Laboratories, Inc. ("Stiefel Labs"), and its principal, Charles Stiefel (collectively, the "Stiefel Defendants").  Plaintiff is a Canadian corporation owned and controlled by Richard MacKay ("MacKay"), a former director and shareholder at Stiefel Labs, and the entity through which Mackay owned all of his shares in Stiefel Labs, including the 750 shares at the center of this lawsuit.  MacKay worked for Stiefel Labs for more than thirty years, primarily helming the company's Canadian division, Stiefel Canada, Inc.  In 2002, MacKay was appointed to the Stiefel Labs board of directors and was later elevated to the position of vice chairman.

In May 2008, MacKay sold approximately 25% of the shares he owned in the company for estate planning purposes.  The shares were sold at an average price of $11,932.97 per share, for a total of $8.9 million.  In 2009, Stiefel Labs merged with an affiliate of GlaxoSmithKline ("GSK"), whereby the company and its shareholders, including MacKay, received approximately $68,000 per share.  As a result of the merger, MacKay received more than $177 million for his remaining outstanding shares.

In 2011, MacKay filed this lawsuit in federal district court, complaining that the 2008 transaction was artificially undervalued and that the Stiefel Defendants harbored secret intentions to take the company public or to sell the company's stock at a higher price as part of the subsequent merger. The Complaint raised six counts: violation of section 10(b) of the Securities and Exchange Act of 1934; violation of the Florida Securities Act; breach of fiduciary duty; fraudulent misrepresentation; negligent misrepresentation; and civil conspiracy.

At the motion to dismiss stage, the Court rejected the argument that Plaintiff's claims were time-barred and also found that they were pled with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). The Court expressly recognized that dismissal on statute of limitations grounds is appropriate only where it is apparent from the face of the Complaint that the claims are time-barred, *see Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005), and that otherwise the issue should be left for resolution at a later stage in the case, *see Infinity Global, LLC v. Resort at Singer Island, Inc.*, 2008 WL 1711535, at *3 (S.D.Fla. Apr. 10, 2008) (Ryskamp, J.). Because the allegations, on their face, did not definitively show that Plaintiff's claims were untimely, the Court found dismissal inappropriate.

Subsequently, the Plaintiff sought, and was granted, permission to amend. The Amended Complaint dropped the Florida Securities Act claim, the civil conspiracy claim, and all claims against Brent and Todd Stiefel, who were named as defendants in the original pleading. The Amended Complaint also removed several key allegations, including that the Stiefel Defendants failed to disclose certain independent third-party evaluations of the stock to MacKay and that he was wholly dependent upon them for information. The Court had relied in part on such allegations in denying the motion to dismiss on statute of limitations grounds.

The Stiefel Defendants now move for summary judgment on the Amended Complaint, once again arguing that Plaintiff's claims are stale, and adding that they fail on the merits as well. Unsurprisingly, Plaintiff responds that there are genuine issues of material fact for trial. Plaintiff also contends that MacKay was not subjectively aware of key facts supporting his claims until after July 7, 2009, when the complaint in *Bacon v. Stiefel Laboratories*, Case No. 09-cv-21871 (S.D. Fla.), was filed. For the reasons explained below, the Court finds that Plaintiff's claims are time-barred. As summary judgment is granted on that basis, the Court does not reach the Stiefel Defendants' alternative argument that they should win on the merits.

## **Statement of Facts**[1]

Stiefel Labs was a privately-held pharmaceutical company founded in 1847. It remained privately-held, with the Stiefel family holding most of the company's shares, until it was acquired by an affiliate of GSK in a 2009 merger. From 2001 until the merger, Charles Stiefel served as chief executive officer ("CEO") and chairman of the board at Stiefel Labs. From 1976 until late 2009, MacKay served as president of Stiefel Canada, a subsidiary of Stiefel Labs, and held a substantial number of shares in Stiefel Labs. Plaintiff 100079 Canada, Inc. was a holding company set up, owned, and controlled by MacKay. MacKay's Stiefel Labs shares were transferred to Plaintiff for holding purposes and to achieve certain tax benefits. As of May 2008, Plaintiff owned approximately 3,300 shares of Stiefel Labs stock.

In 2002, MacKay was appointed to the board of directors of Stiefel Labs. In 2007, he became vice chairman of the board. As a board member, MacKay was required to, and did, attend quarterly board meetings. While MacKay claims he was not sophisticated or well versed in matters of finance, as a board member he bore responsibility for appointing fiduciaries of the employee stock bonus plan, appointing the company's officers, and voting on items that required board approval, including significant corporate transactions.

Stiefel Labs retained accountant Terence Bogush to perform the annual valuations of the employee stock bonus plan. Those valuations were based on the end of the plan year, which was always March 31. Stiefel Labs stock was not traded on a public market and thus the company was under no obligation to buy it back at any certain time or price. Nevertheless, if Stiefel Labs had the cash available and if the terms proposed by the shareholder were acceptable, the company would occasionally purchase stock at a shareholder's request. When purchasing such shares, Stiefel Labs used as a benchmark the annual valuations that Bogush performed for the employee stock bonus plan. Shares were generally purchased at a discount from the most recent Bogush valuation. For example, in 2000, MacKay became interested in selling some shares to fund the construction of a vacation home. Stiefel Labs accepted MacKay's offer and purchased 200 shares

---

[1] Consistent with Federal Rule of Civil Procedure 56, the facts in the section above are material and undisputed, and construed in the light most favorable to the nonmoving party. *See Wolicki-Gables v. Arrow Int'l, Inc.*, 634 F.3d 1296, 1300 (11th Cir. 2011) (summary judgment appropriate only if no genuine issue of material fact). Facts proffered by one party or the other that are not included above are either not material, not undisputed, or both. As such, the Court leaves those facts out.

from the Plaintiff at $5,157 per share. That price per share, which MacKay offered, was based on a 10% discount off the year 2000 valuation of the company's employee stock bonus plan.

The company bought stock back from other shareholders in the years that followed. On April 5, 2004, Charles Stiefel notified members of the board, including MacKay, that Stiefel Labs had received an unsolicited offer to buy back 878 shares of company stock from Columbia University. Specifically, Columbia University offered to sell its first 300 shares at a 15% discount from the per share price set forth in the 2003 Bogush valuation, the next 150 shares at a 17% discount, the next 150 shares at a 19% discount, the next 150 shares at a 23% discount, and at a 30% discount for any shares in excess of 750. This offer was accepted and approved by the full board, including MacKay, on April 6, 2004. In addition, the board, including MacKay, approved an agreement in 2005 allowing the stock of the "D'Anconia" shareholders, a group largely comprised of Charles Stiefel's relatives, to be converted into company common stock and then purchased by Stiefel Labs at per share prices ranging from 10% to 45% lower than the 2004 Bogush valuation.

In late 2006, Stiefel Labs began considering a private equity investment in order to fund the acquisition of another pharmaceutical company called Connetics. In December of that year, MacKay was informed that the company had received preliminary term sheets from several potential investors and that a decision had been made to negotiate exclusively with Blackstone Healthcare Partners LLC ("Blackstone"). On December 18, 2006, the board, including MacKay, received an updated term sheet from Blackstone stating that its proposed private equity investment would be based on a pre-money equity valuation of $1.8 billion. The board members were also given drafts of the securities purchase agreement and amended bylaws for the company. MacKay testified that he did not compare the Blackstone valuation with the Bogush valuations and that in his mind, the Blackstone investment was intended as a loan. Later in the month, Stiefel Labs terminated the private equity negotiations with Blackstone and secured a loan in excess of $500 million from Deutsche Bank and others to fund its acquisition of Connetics on December 28, 2006.

Subsequently, in January 2007, Blackstone expressed interest in perhaps acquiring all of Stiefel Labs. But Charles Stiefel, who alone had veto power due to his majority ownership, was purportedly not interested. Nevertheless, private equity negotiations recommenced in mid-2007 and, on August 1, 2007, the board, including MacKay, received an updated private equity offer

letter from Blackstone with a $2.9 billion enterprise valuation. MacKay and the other Board members were informed by Charles Stiefel that Blackstone's valuation of Stiefel Labs was higher than it was in December 2006 and also higher than the private equity valuation provided by TA Associates, another private equity firm.

Charles Stiefel also forwarded current and updated documents drafts to the board members between August 1 and August 3. Those documents defined the "conversion price" and the "stated value" of the Stiefel Labs preferred stock at $60,407.60 per share. The draft legal agreements for the proposed investment reflected that Blackstone and Stiefel Labs were negotiating over Blackstone's investor rights in the event of an initial public offering ("IPO") or sale of the company. On MacKay's motion, the board approved Blackstone's private equity investment on August 6, 2007. MacKay also voted Plaintiff's shares in favor of the deal.

On August 9, 2007, Stiefel Labs made an announcement about Blackstone's investment to company employees, including MacKay. The announcement advised them that while there were currently no plans for Stiefel Labs to become a publicly traded company, Blackstone had a defined exit arrangement with the company at the end of eight years and that "Stiefel may choose to buy back its shares or exercise other options, one of which might be an initial public offering," as "[s]enior management continues to evaluate all options when looking at the long-term financial needs of the Company." Charles Stiefel emphasized, however, that Stiefel Labs would continue to be a privately held company.

MacKay forwarded this announcement to his financial advisor and tax lawyer, Robert Raich, on August 15, 2007. In a letter dated January 23, 2008, Raich advised MacKay to consider selling some of Plaintiff's common stock shares on an annual basis for estate planning purposes. In the letter, Raich stated that the sale of stock would allow MacKay to "raise some immediate cash as it does not make sense that you are so rich on paper, yet you do not have much liquidity." Raich further advised MacKay that "[n]otwithstanding that [Plaintiff] may be selling these Stiefel shares 'cheap,' it does not make sense for you to keep hoarding these Stiefel shares for future generations when you and [your wife] could enjoy the money now and in a tax efficient manner."

In April or May 2008, after receiving Raich's advice, MacKay, who was then 75 years of age, contacted Steve Karasick, a senior officer at Stiefel Labs, to discuss selling 100 shares of common stock per year for an indefinite number of years. Between May 7, 2008 and May 13, 2008, Karasick spoke with Charles Stiefel and the company's chief financial officer ("CFO")

about MacKay's request to sell 100 shares annually for the next several years. Charles Stiefel responded that "[i]f the money was available, naturally we would honor anything that [MacKay] wanted to do in the future, but we [cannot] guarantee now that we'll know what the company's situation will be in the future, so we can't do it." The company's CFO concurred. Thus, Karasick informed MacKay during a telephone call on May 14, 2008 that Stiefel Labs could not guarantee it would be positioned to purchase stock from Plaintiff on an annual basis, but that the company would consider any offers Plaintiff wished to make each year.

Karasick also told MacKay that if he wanted to offer any stock for purchase to the company, Charles Stiefel would review the offer. To give MacKay some guidance on the terms on which the company had previously agreed to purchase large blocks of non-employee stock bonus plan shares, Karasick discussed with MacKay the terms that the board had approved when agreeing to purchase Columbia University's shares. After Karasick reviewed this information with him, MacKay indicated he might be interested in selling 750 shares back to the company.

Following their conversation, Karasick emailed MacKay a spreadsheet that included the per share price set forth in the then-current 2007 Bogush valuation[2] and a schedule of the discounted prices based on the Columbia University transaction. A few minutes after receiving Karasick's email and spreadsheet, MacKay told Karasick that he wanted proceed with a stock sale at those prices, based on the 2007 Bogush valuation. The 2007 Bogush valuation was $14,517 per share, or $785 million pre-discount for all common shares. The 2007 Bogush valuation did not take into account the impact of Blackstone's August 2007 private equity investment because the valuation preceded Blackstone's investment in time and could not properly account for an event that occurred months after the valuation date of March 31, 2007. MacKay did not conduct his own evaluation or analysis of the value of his common stock prior to selling it to Stiefel Labs, nor did he request a copy of the 2007 Bogush valuation prior to selling, although it was available to Plaintiff as shareholder and to MacKay as board member. Indeed, Charles Stiefel had previously announced the $14,517 per share valuation in a December 2007 email, which MacKay received.

On May 15, 2008, MacKay sent Charles Stiefel an email advising him that he had decided to sell some shares, even though "[his] own inclination would have been not to sell the shares since I strongly believe in the future of Stiefel." MacKay also explained that "in view of the fact

---

[2] The 2008 Bogush valuation was not completed or announced until months after Plaintiff's May 2008 stock transaction, so the 2007 valuation was the most current.

that the company cannot fully guarantee continuous annual [buy]-backs, my fiscal advisor Robert Raich feels that that would give [my wife] a greater sense of security, should something happen to me, and [she would] not have to worry each year whether the company would [buy]-back shares." Charles Stiefel responded to MacKay's email the same day and stated that "I am just happy that [Stiefel Labs] has sufficient cash at this time to be able to accommodate whatever you want to do." Charlie also explained to MacKay that he needed to make a formal offer in writing if he wanted to sell back any of Plaintiff's shares to the company.

The next day, on May 16, 2008, MacKay sent Charles Stiefel another email formally offering to sell 750 of Plaintiff's shares pursuant to the schedule attached to Karasick's May 14, 2008 email. Charles Stiefel accepted the offer on behalf of the company that same day. MacKay did not have any further discussions with Charles Stiefel about the sale, nor did he discuss with Charles Stiefel the per share sales price. Likewise, MacKay did not speak with Brent or Todd Stiefel about his decision to sell Plaintiff's shares or about the per share price he was receiving.

After the company approved the transaction and the necessary paperwork was completed, payment was sent to Plaintiff, care of MacKay, on June 18, 2008. The decision to sell 750 shares (as opposed to more shares or less) was made by MacKay, and he admits that the company did not pressure him into the 2008 transaction. In addition, MacKay sold Plaintiff's stock even though he expected the value of the company's stock bonus plan shares to go up every year.

In late November 2008, several months after Plaintiff's stock transaction was completed, Charles Stiefel learned from Blackstone's representative on the board, Anjan Mukherjee, that Sanofi-Aventis ("Sanofi"), a large French-based pharmaceutical company, might be interested in discussing a possible future business relationship, including, potentially, an acquisition. Charles Stiefel discussed Sanofi's possible interest with fellow board members and executives, Brent and Todd Stiefel, on November 26, 2008. Later that day, Charles Stiefel informed Mukherjee that he had discussed Sanofi's interest with Todd and Brent Stiefel and asked for guidance. Mukherjee suggested that they consider a possible sale now or wait five years. Mukherjee also speculated as to what a potential strategic acquirer might, depending on the circumstances, be willing to pay to purchase the company. The decision to explore Sanofi's interest was made later that day.

On December 22, 2008, Charles Stiefel had a short, introductory meeting with the new CEO of Sanofi concerning the company's interest in a possible future business relationship. Thereafter, on or about January 1, 2009, Stiefel Labs engaged Blackstone to assist in exploring a

possible transaction. The sales exploration process (know as "Project Jump") was kept confidential, but a limited number of executives were told about it sometime in late January 2009. MacKay, who was not directly involved in Project Jump, was first notified of Sanofi's interest on February 19, 2009.  MacKay testified that he was "shocked" when he learned of the potential sale and that the unequivocal and constant message from Charles and Todd Stiefel during strategy meetings spanning August 2007 through April 2009 had been that the company would always remain privately held.  Additionally, in early 2008, MacKay had a conversation with Todd Stiefel, during which Todd expressed his displeasure with Blackstone and commented that the company would always be kept in the family.

On March 24, 2009, Stiefel Labs received preliminary, non-binding bid letters from GSK and Sanofi to acquire the company for $3.1 billion and $2.8 billion, respectively.  Charles Stiefel informed MacKay of these preliminary bids the same day and, at the same time, provided MacKay with a summary of the preliminary bids and outstanding due diligence.  After conducting additional due diligence, GSK submitted an updated offer on April 16, 2009.  The board approved the merger agreement with GSK on April 19, 2009, with GSK acquiring Stiefel Labs for approximately $2.9 billion in cash.  The agreement was executed the next day and the merger closed on July 22, 2009.  As a result of the merger transaction, MacKay received over $177 million for Plaintiff's remaining shares of common stock.  MacKay maintains that had he known, among other facts, that an IPO was a realistic possibility, or that Charles Stiefel was receptive to the idea of a sale, he would not have sold his stock at the time or price that he did in May 2008.

### **Legal Standard**

Under Federal Rule of Civil Procedure 56, "summary judgment is appropriate where there 'is no genuine issue as to any material fact' and the moving party is 'entitled to a judgment as a matter of law.'" *See Alabama v. N. Carolina*, 130 S. Ct. 2295, 2308 (2010) (quoting Fed. R. Civ. P. 56(a)).  At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmovant, *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970), and it may not weigh conflicting evidence to resolve disputed factual issues, *see Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007).  Yet, the existence of some factual disputes between litigants will not defeat an otherwise properly grounded summary judgment motion: "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[O]nce the moving party has met its burden of showing a basis for the motion, the nonmoving party is required to 'go beyond the pleadings' and present competent evidence designating 'specific facts showing that there is a genuine issue for trial.'" *United States v. $183,791.00*, 391 F. App'x 791, 794 (11th Cir. 2010). Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but [instead] must set forth specific facts showing that there is a genuine issue for trial." *See Anderson*, 477 U.S. at 248. "Likewise, a [nonmovant] cannot defeat summary judgment by relying upon conclusory assertions." *Maddox-Jones v. Bd. of Regents of Univ. of Ga.*, 2011 WL 5903518, at *2 (11th Cir. Nov. 22, 2011). Mere "metaphysical doubt as to the material facts" will not suffice. *Matsushita*, 475 U.S. at 586.

"A claim barred by the applicable statute of limitations may properly be disposed of by summary judgment." *Higgenbotham v. Ochsner Found. Hosp.*, 607 F.2d 653, 657 (5th Cir. 1979).[3] "At the summary judgment stage, the moving party must show that there is no genuine issue of material fact as to whether the statute of limitations has run." *Ashcroft v. Randel*, 391 F. Supp. 2d 1214, 1219 (N.D. Ga. 2005); *see also Higgenbotham*, 607 F.2d at 657. "That is to say, the moving party must establish that 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party'" on the timeliness issue. *Randel*, 391 F. Supp. 2d at 1219.

### Legal Analysis

Plaintiff's federal securities law claim[4] had to be brought within the earlier of "2 years after the discovery of the facts constituting the violation," or "5 years after such violation." *See* 28 U.S.C. § 1658(b)(1). No one disputes that Plaintiff filed suit within five years of the alleged violation. The only question is whether this lawsuit was filed within two years of time that MacKay discovered "the facts constituting the violation." *See id.* In *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1789-90 (2010), the Supreme Court held that "a cause of action [for securities fraud] accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' – whichever comes first."

---

[3] District courts within the Eleventh Circuit are bound by decisions of the former Fifth Circuit decided prior to October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[4] In Count One of the Amended Complaint, Plaintiff alleges that the Stiefel Defendants acted to deceive MacKay as to the value of his company stock and as to their intentions to remain privately held, while actually planning to sell the company or take it public. Plaintiff also alleges that the Stiefel Defendants caused him to sell his shares at an artificially low price, all in violation of the federal securities laws. *See* Am. Compl. ¶¶ 84-97.

The Court further held that "the 'facts constituting the violation' include the fact of scienter, 'a mental state embracing intent to deceive, manipulate, or defraud[.]'" *Id.* at 1790.

MacKay maintains that he did not actually discover all "the facts constituting the violation," including scienter, until after July 7, 2009, when the *Bacon* lawsuit was filed. Because the Complaint in this case was filed on July 1, 2011, Plaintiff's claim would be timely, though just barely, if measured from the start of the *Bacon* lawsuit. Plaintiff would be well in the clear if, as argued, MacKay did not really discover the facts supporting his claim until certain documents were produced during discovery in the *Bacon* case. The Stiefel Defendants contend, however, that a reasonably diligent plaintiff would have discovered all "the facts constituting the violation" well before that time and, as such, Plaintiff's claim is too late.

So, the Court must decide whether MacKay did discover, or should have discovered with reasonable diligence, "the facts constituting the violation" prior to July 1, 2009 – two years before he commenced this lawsuit. The clear answer is yes. To the extent that MacKay did not have complete actual knowledge, the following undisputed facts demonstrate conclusively that a reasonably diligent person in MacKay's position would have discovered "the facts constituting the violation," including scienter, no later than April 19, 2009 – the date that the board, including MacKay, approved the merger with GSK:

- December 18, 2006: MacKay knew Blackstone was considering a private equity investment in Stiefel Labs with a pre-money equity valuation of $1.8 billion. Even though MacKay purportedly thought of Blackstone's investment as a loan, the key fact is that Blackstone valued the enterprise at nearly $2 billion.

- August 2007: MacKay knew that Blackstone had updated its enterprise valuation to $2.9 billion, and that Stiefel Labs preferred stock was valued at more than $60,000 per preferred share.

- August 2007: MacKay knew that Blackstone and Stiefel Labs were negotiating over Blackstone's investor rights in the event of an initial public offering ("IPO") or sale of the company in the coming years.

- August 2007: MacKay voted to approve Blackstone's private equity investment, and it was approved by the board. Thus, MacKay sanctioned a deal in which the Blackstone firm paid over $60,000 per preferred share of Stiefel Labs stock.

- August 2007: MacKay knew that notwithstanding Blackstone's investment, the Stiefel Defendants were representing that going public was not an option the company was immediately considering, but that an IPO or sale might be considered down the road. This information was set forth in a company announcement, which MacKay forwarded to his financial advisor and tax lawyer. MacKay also knew that Charles Stiefel was continuing to emphasize that Stiefel Labs would remain a privately held company.

- January 2008: MacKay knew from his financial advisor that he "may be selling these Stiefel shares 'cheap,'" if sold to Stiefel Labs at a discount on the 2007 Bogush valuation. MacKay accepted the advice to sell them anyway.

- May 2008: MacKay had access to the Bogush valuations as a board member and could have requested to see the 2007 valuation at any time.

- May/June 2008: MacKay knew he was getting $11,932.97 per share for the 750 shares of common stock he decided to sell back to Stiefel Labs. MacKay knew that the sales price was based on a discount from the 2007 Bogush valuation. He also knew the price per share was roughly a fifth of Blackstone's valuation of preferred shares just months earlier.

- February 2009: MacKay knew about Project Jump and Sanofi's interest in Stiefel Labs. At that point, MacKay also knew, or should have known, that the Stiefel Defendants had commenced a sale exploration process upon receiving interest from Sanofi back in November 2008, thus revealing a "secret plan" to sell the company that MacKay was kept in the dark about for several months.

- From August 2007 to April 2009: MacKay knew that Charles and Todd Stiefel were representing during strategy meetings that the company would always remain privately held. Additionally, in early 2008, MacKay had a conversation with Todd Stiefel, during which Todd expressed his displeasure with Blackstone and commented that the company would always be kept in the family.

- March 2009: MacKay knew Stiefel Labs had received preliminary, non-binding bid letters from both GSK and Sanofi to acquire the company for $3.1 billion and $2.8 billion, respectively.

- April 19, 2009: MacKay, along with the board, voted to approve the merger agreement with GSK. In so doing, MacKay knew that GSK would acquire Stiefel Labs for approximately $2.9 billion in cash, which equated to approximately $68,000 per share – even for common stock shares such as his.

In denying the Stiefel Defendants' motion to dismiss, the Court observed that "[o]ne might reasonably assume that the vast discrepancy between the price MacKay received for his shares in June 2008, and the price paid by GSK ten months later, would have put a reasonably diligent plaintiff on notice of the need to investigate," but that "it is not at all clear that this fact alone would be enough for a reasonably diligent plaintiff to discover all 'the facts constituting the violation,' including 'the fact of [the Stiefel Defendants'] scienter, 'a mental state embracing [their] intent to deceive, manipulate, or defraud[.]'" *See* Dismissal Order [ECF No. 23] at 12 (quoting *Merck*, 130 S. Ct. at 1790). At this point in the case, however, we have much more than the mere fact of the discrepancy.

For one, Plaintiff amended the Complaint to remove the allegations that the Stiefel Defendants concealed Blackstone's valuations and MacKay now admits that he actually had knowledge of those valuations as a board member.  Moreover, as outlined above, we have facts showing that prior to April 19, 2009, MacKay knew of Blackstone's private equity investment, he knew of Blackstone's $1.8 billion and $2.9 billion enterprise valuations, he knew that he was getting nearly $50,000 per share less than Blackstone paid for its preferred shares, he knew of Sanofi's interest in acquiring the company, he knew of the competing high valuations and offers from GSK and Sanofi to acquire the company, and he knew GSK acquired the company at a per share price that was nearly $60,000 more (even for common shares like his) than he received for several months earlier.

He also knew that while all of this was going on, the Stiefel Defendants continued to represent that the company really had no plan to go public and would, in fact, always remain privately held.  In other words, the Stiefel Defendants were saying one thing (in essence, "we are going to keep the company privately held"), while doing another (involving Blackstone, having secret discussions with Sanofi about selling or going public, entertaining acquisition bids from Sanofi and GSK, and in fact selling the company to GSK).  The Stiefel Defendants also implicitly represented to MacKay that the 2007 Bogush valuation was a fair indicator of the value of his shares by suggesting that he offer them for sale at a discount from that valuation, while at the same time knowing of Blackstone's much higher appraisals of the enterprise.  These acts and representations, in their totality, were more than enough for MacKay to know, with reasonable diligence, all "the facts constituting the violation," including scienter by the time the merger was approved in April 2009.

Thus, upon considering the undisputed evidence, the Court concludes that any reasonably diligent plaintiff would have discovered the facts supporting his claim by, at the absolute latest, April 19, 2009 – when the board, including MacKay, approved the merger with GSK.  MacKay's arguments to the contrary, and his professed lack of knowledge, are unreasonable as a matter of law.  Because Plaintiff filed suit more than two years after April 19, 2009, the federal securities law claim is time-barred.

Plaintiff's common law claims[5] under Delaware law[6] are doomed to the same fate, but for slightly different reasons. In Delaware, claims for breach of fiduciary duty and misrepresentation are governed by a three-year statute of limitations. *See In re Am. Int'l Group, Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009); *Meer v. Aharoni*, 2010 WL 2573767, at *4 n.6 (Del. Ch. June 28, 2010). "The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by a defendant." *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007). Here, both parties agree that MacKay suffered injury for purposes of the statute of limitations on June 18, 2008, the date he sold back 750 shares to Stiefel Labs at a deflated price. Because this lawsuit was commenced more than three years later, on July 1, 2011, Plaintiff's common law claims are time-barred, unless a tolling theory applies. When claims are facially time-barred, as they are here, "the plaintiff bears the burden of showing why the statute of limitations should be tolled." *See Vichi v. Koninklijke Philips Elec. N.V.*, 62 A.3d 26, 43 (Del. Ch. 2012).

According to Plaintiff, the statute of limitations on the common law claims was equitably tolled until "March or April 2009, when Mr. MacKay learned that [Stiefel Labs] might be purchased for approximately $70,000 per share[.]" Resp. at 19. Plaintiff maintains that prior to that time, MacKay had no reason to "comb through" the other objective indicators pre-dating GSK's acquisition and "piece together" the facts suggesting that the company may be sold and that MacKay's shares were probably worth substantially more than he received in the May/June 2008 transaction. *See id.* Equitable tolling is the only claim-saving doctrine under Delaware law that Plaintiff invokes. *See* Resp. at 19-20.

---

[5] Plaintiff alleges a common law claim for breach of fiduciary duty in Court Three of the Amended Complaint, a claim for fraudulent misrepresentation in Count Four, and a claim for negligent misrepresentation in Count Five. *See* Am. Compl. ¶¶ 98-118. When amending the Complaint, Plaintiff dropped the Florida Securities Act claim in Count Two and the civil conspiracy claim in Count Six, as well as all claims against Brent and Todd Stiefel. *Compare* Compl. *with* Am. Compl.

[6] At the dismissal stage, the Court found that Delaware law applied to Plaintiff's common law claims under the so-called "internal affairs" doctrine, which Florida recognizes. *See* Dismissal Order [ECF No. 23] at 13-16. In so ruling, the Court noted that MacKay's allegations implicated the "internal affairs" of the corporation and that Stiefel Labs was incorporated in Delaware. *See id.* Both parties appear to agree that Delaware law does in fact apply, as they've both made their arguments as if it does. The Court will therefore apply Delaware law at the summary judgment stage, just as it did earlier in the case.

The Stiefel Defendants contend that "[e]quitable tolling requires proof of (1) an 'inherently unknowable' injury; and (2) a 'blamelessly ignorant' plaintiff." *See* Mot. at 14. They have confused Delaware's tolling rules, however. Under Delaware law, "there are three commonly recognized theories that can support tolling: inherently unknowable injuries, fraudulent concealment, and equitable tolling." *Jepsco, Ltd. v. B.F. Rich Co.*, 2013 WL 593664, at *8 (Del. Ch. Feb. 14, 2013). Equitable tolling applies where a plaintiff reasonably relies upon a fiduciary to provide information or perform a duty. *See Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008). The Stiefel Defendants appear to raise the so-called doctrine of "inherently unknowable injuries," a separate tolling theory:

> Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility. For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury.

*In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. July 17, 1998) (footnotes and citations omitted).

Because the Plaintiff does not argue that the "inherently unknowable injuries" doctrine applies here, the Court has no occasion to apply it. In any case, the doctrine is a poor fit on these facts, for the reasons outlined by the Stiefel Defendants. There were objective indicators to put MacKay on inquiry notice (hence, the injury was not "unknowable") and he was not "blamelessly ignorant." *See* Mot. at 4-7; Reply at 14-15. To the extent MacKay was ignorant at all, it was his own fault given the access he had, or could have had, as a board member to the relevant information that would have apprised him of his common law claims. *See* Mot. at 4-7; Reply at 14-15.

Returning to equitable tolling, the Plaintiff has not carried its burden to show that the statute of limitations was tolled. First of all, equitable tolling applies under Delaware law only where "a plaintiff reasonably relies on the competence and good faith of a fiduciary." *See Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008); *In re Am. Int'l Group, Inc.*, 965 A.2d 763, 812 (Del. Ch. 2009). "Underlying this doctrine is the idea that even an attentive and diligent investor may rely, in complete propriety, upon the good faith of fiduciaries." *See Weiss*, 948 A.2d at 451. Here, Plaintiff fails to argue, much less carry his burden to show, that MacKay reasonably relied upon the Stiefel Defendants, as fiduciaries, for purposes of equitable tolling. Nor does Plaintiff argue,

much less show, that MacKay is even the kind of investor-plaintiff who would be eligible for equitable tolling in the first place. MacKay was himself a board member and corporate fiduciary, not a mere shareholder or investor forced to rely upon those in positions of power for all his information. Indeed, by virtue of his post on the board and his relationship with the Stiefel Defendants, MacKay had ready access to the type of high-level corporate information that a typical shareholder would not. For such a person to invoke equitable tolling, the Court would, in effect, have to find that MacKay abdicated his own duties as a board member and fiduciary and would seemingly extend the doctrine beyond its intended purpose. In the absence of any case law or argument demonstrating that equitable tolling was intended to apply under facts like these, the Court will not allow the Plaintiff to invoke the doctrine here.

In any event, even if equitable tolling applied on these facts, Plaintiff would still lose. When tolling applies under Delaware law, "relief from the statute [of limitations] extends only until the plaintiff is put on inquiry notice." *In re Tyson Foods*, 919 A.2d at 584; *Weiss*, 948 A.2d at 451. "That is to say, no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." *In re Tyson Foods*, 919 A.2d at 584. "Inquiry notice does not require full knowledge of the material facts; rather, plaintiffs are on inquiry notice when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued, would lead to the discovery of the injury." *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005); *Smith v. McGee*, 2006 WL 3000363, at *3 (Del. Ch. Oct. 16, 2006) ("Plaintiff is on inquiry notice if he 'is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious.'").

At the dismissal stage, "construing the facts and inferences in the Plaintiff's favor," the Court found "the latest possible date that MacKay reasonably could be deemed to have acquired "inquiry notice" [was] April 2009, when the board members approved the sale of the company to GSK for approximately $68,000 per share." *See* Dismissal Order [ECF No. 23] at 20. At that time, the Court did not have the benefit of the record now before it. Now, the undisputed factual record demonstrates clearly that Plaintiff was on inquiry notice by June 18, 2008, the date that MacKay sold 750 shares back to the company. By that date, MacKay knew about Blackstone's private equity investment, he knew of Blackstone's $1.8 billion and $2.9 billion enterprise valuations, he knew an IPO or sale might be considered in eight years and he forwarded that

information to his financial advisor and tax lawyer, and he knew that the $11,932.97 price per share he was getting was nearly $50,000 per share less than Blackstone paid for the preferred shares just months earlier. These facts, which MacKay either knew or should have known by May/June 2008, were sufficient to raise the suspicions of a person of ordinary intelligence and to prompt an investigation. *Pomeranz*, 2005 WL 217039, at *3; *Smith*, 2006 WL 3000363, at *3.

Plaintiff nonetheless maintains that MacKay "had no reason to comb through" the relevant documents and "piece together" the key facts before March/April 2009, when he learned that Stiefel Labs might be acquired at $70,000 per share. Resp. at 19. But the statute of limitations does not wait for the timid plaintiff who expects to be hit over the head with every material fact supporting his claims. *See Wood v. Frank E. Best, Inc.*, 1999 WL 504779, at *2 n.8 (Del. Ch. July 9, 1999) ("The plaintiffs' argument is akin to a claim that I would have brought a timely conversion action for theft of my shotgun, if only I had known that you intended to shoot me with it.").

> The difficulty for [Plaintiff] is that [this] argument depends on the premise that inquiry notice only exists once [MacKay was] aware of all material facts relevant to [his] claims. That is not the case. Equitable exceptions to statutes of limitations are narrow and designed to prevent injustice. Once a plaintiff is on notice of facts that ought to make [him] suspect wrongdoing, [he] is obliged to diligently investigate and to file within the limitations period as measured from that time.

*Pomeranz*, 2005 WL 217039, at *12. Here, Plaintiff failed to do so. "Delaware law expects some initiative from plaintiffs, even those who rely on fiduciaries." *Pomeranz*, 2005 WL 217039, at *12. Indeed, "the trusting plaintiff still must be reasonably attentive to his interests," and "even where [the] defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying [his] claim is readily available." *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998).

The fact of Blackstone's private equity investment, and the great discrepancy between the price per share MacKay received for his common stock and the much higher price per share Blackstone paid for preferred stock should have been regarded as "red flags" to MacKay, prompting inquiry. *See id.* MacKay was "not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures [he] received regularly" (or could have received, if he asked for them) were sufficient to put him on notice of his claims by May/June 2008. *See id.* at *9. Because MacKay dallied for more than three years before filing suit on July 1, 2011, his common law claims come too late.

## Conclusion

The moral of this story is that "equity aids the vigilant, not those who slumber on their rights." *See Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982). For the reasons explained above, the Court concludes that the Stiefel Defendants are entitled to summary judgment on statute of limitations grounds. Because Plaintiff's federal and common law claims are all time-barred as a matter of law, the Court does not reach the merits of those claims.

Accordingly, it is hereby **ORDERED and ADJUDGED** that the Stiefel Defendants' Motion for Summary Judgment [ECF No. 47] is **GRANTED**. The Court will enter Final Judgment in favor of the Stiefel Defendants by separate Order.

**DONE and ORDERED** in chambers at Miami, Florida on June 21, 2013.

_____
**ROBERT N. SCOLA, JR.**
**UNITED STATES DISTRICT JUDGE**